IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:09CR187 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| DANNY REAVES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the defendant's motion for new trial, Filing No. 105. This Memorandum and Order supplements findings made on the record at hearings on June 16, 2010, and July 8, 2010. After a jury trial from November 17, 2009, to November 23, 2009, Reaves was convicted of interfering with, delaying, affecting or obstructing interstate commerce by robbing an armored car and of using or carrying a firearm during or in relation to that crime. Filing No. 78, Verdict. In his motion, Reaves asks the court to vacate the jury verdict and order a new trial under Federal Rule of Criminal Procedure 33 because of newly discovered evidence that he asserts was withheld by the government in violation of *Brady v. Maryland,* 373 U.S. 83 (1963).

**I. BACKGROUND**

The newly-discovered evidence at issue consists of phone records. The government concedes that the records at issue were in the government's possession at the time of trial, but, inadvertently, they were not produced to the defense. After the trial, on December 21, 2009, Detective Chandler provided a copy of the records at issue to defense counsel.[1] They were also provided to the prosecutor for the first time on that date.

---

[1]The records at issue are cellular phone records from Reaves's two phones from October 1, 2008, through April 15, 2009.

The court held an evidentiary hearing on the motion on June 16, 2010, and July 8, 2010. The trial testimony of Omaha Police Detective Matthew Chandler and April Ruffin was admitted into evidence at the hearing. *See* Filing No. 104, Testimony of Matthew Chandler ("Chandler trial test."); Filing No. 101, Testimony of April Ruffin ("Ruffin trial test."). The armored car robbery at issue occurred on May 1, 2009. The evidence adduced at trial showed that a Taser was involved in the robbery. Notably, Ruffin testified that she purchased the Taser for Reaves on January 6, 2009, registered it, and gave it to him that same day. Filing No. 101, Ruffin trial test. at 13 (Page ID # 340). At trial, Ruffin was asked if she had any contact with Reaves from the date she gave him the Taser on January 6, 2009, until the date she was questioned by a detective on May 5, 2009. *Id.* at 13, 15 (Page ID # 340, 342). At trial, Detective Chandler testified that he issued a subpoena for telephone records of what he believed was Reaves's cell phone and received the subpoena return on April 15, 2009. Filing No. 104, Chandler trial test. at 10 (Page ID # 387). Defense counsel asked whether Chandler found any records of telephone calls between Reaves's number and the number of April Ruffin. *Id.* He responded that he had. *Id.* The following colloquy ensued:

    Q.    Was it before or after January 6th?
    A.    Before.
    Q.    Do you recall how long before?
    A.    Thanksgiving to Christmas of 2008.
    Q.    And do you have those records?
    A.    Yes.
    Q.    And you would provide those records to me?
    A.    I believe they were in discovery.
    Q.    You would provide them to me if I don't have them?
    A.    Sure.

*Id.* at 11. Detective Chandler also testified that he had subpoenaed April Ruffin's records on two occasions, but that the first subpoena was misdated and the second subpoena was ignored by the service provider. *Id.* at 11-12 (Page ID # 388-89). The following colloquy then ensued:

2

> Q. Officer, you checked the telephone calls between Mr. Reaves and Ms. Ruffin from approximately Thanksgiving of '08 until January 1st of '09.
> A. I did.
> Q. And the conclusion that you saw was that there was approximately how many telephone calls between the two of them?
> A. Nine telephone calls and one text message.
> Q. And were there any telephone calls or text messages between the two of them between January 1st and January 6th?
> A. Not on the two phone numbers that I checked.
> Q. I'll go even further to make sure I'm safe, on January 7th?
> A. Same answer, not on the two numbers that I had.

*Id.* at 17-18 (Page ID # 394-95).

Detective Chandler also testified at the motion hearing. *See* Filing No. 113, Motion Hearing Transcript ("Tr.") at 2-52 (Page ID # at 435-85). He testified that he was involved in the investigation of the robbery at issue as well as a robbery of TierOne Bank, along with Jonathan Robitaille of the FBI. *Id.* at 3-4 (Page ID # 436-37). At the motion hearing, Chandler testified about a conversation he had with defense counsel during the course of the trial regarding the phone records:

> Mr. O'Connor asked me about some cellular phone records that I'd received as a result of having subpoenaed the defendant's known cell phone number. I explained to him my analysis of those calls and my understanding was that there were a number of contacts between the defendant and a person named April Ruffin and that those—the time frame for those was Thanksgiving 2008 through Christmas of 2008.

*Id.* at 4-5 (Page ID # 437-38). He further testified that he told defense counsel that "if need be [he] would obtain those records and get those records to [defense counsel]" and that defense counsel requested the records on December 21, 2009. *Id.* at 5 (Page ID # 438). He stated that defense counsel had asked to review evidence on another case in the Omaha Police Department evidence room and "during that conversation he asked if I would send him all the cellular—or all the telephone subpoena returns that I had relating to his defendant, another person named Shannon Jackson and others that we believe are involved." *Id.* at 5-6

3

(Page ID # 438-39). The other case also involved Reaves. *Id.* at 7 (Page ID # 440). At that time, Chandler forwarded to defense counsel the e-mail he received from the telecommunications provider in response to the subpoena. *Id.* The records that were forwarded to defense counsel were billing records of Reaves's cell phone. *Id.* at 8 (Page ID # 441). When Chandler first reviewed the records, he determined that there had been no contacts between Reaves's cell phone and Ruffin's cell phone from January 6th, 2009, the date of the activation of the Taser, through the date of the armored car robbery. *Id.* at 9 (Page ID # 442).

After that, defense counsel's office and Chandler exchanged e-mails regarding the telephone contacts. *Id.* at 10-11 (Page ID # 443-44). Defense counsel's office provided a new telephone number for April Ruffin, ending in 9786, that Chandler had not known about. *Id.* Chandler testified that Ruffin gave him her cell phone number and he had obtained a home phone number from police records, but did not suspect she had another land line. *Id.* at 11 (Page ID # 444). He testified that he then went through the billing records to determine the number and nature of contacts between the new land line associated with Ruffin and Reaves's cell phone. *Id.* He found there were eleven contacts between the two numbers—ten on March 7, 2009, and one on April 14th, 2009. *Id.* All were placed from the land line to Reaves's cell phone and all were of short duration—30 seconds or less. *Id.* at 15 (Page ID # 448). He further testified that a series of similar short-duration calls generally indicates phone calls in which a conversation did not take place. *Id.* at 17 (Page ID # 450).

The evidence adduced at trial regarding the Reaves's guilt shows that an armored car robbery took place in the parking lot of the Douglas County Treasurer's Office on North 30th Street in Omaha, Nebraska, on May 1, 2009. Princeton Hervey and Matthew Gutierrez, the Rochester Armored Car employees who were robbed, testified to the circumstances of the

4

robbery. They testified they were approached by two individuals wearing dark clothing with their faces covered. One of the robbers held a Taser. Princeton Hervey testified that he felt the prong of the Taser hit his left shoulder. He exchanged gunfire with the robbers and they fled. He fired at them as they fled and he was sure that he shot at least one, if not both of them. Hervey was shot in the leg. Gutierrez testified that he observed the exchange of gunfire and saw two men with dark bandanas covering their faces. One robber grabbed the money bags and ran toward a parked vehicle. The vehicle, a white van, then drove out of the north end of the parking lot. Neither Gutierrez nor Hervey nor any of the witnesses observed a bystander caught in the crossfire.

The Omaha Police Department crime lab technicians investigated the scene. They testified they found shell casings and blood evidence that later generated a DNA profile that matched Reaves. A Taser was also recovered at the scene. The Taser was traced through its serial number and was determined to have been sold to April Ruffin. Ruffin testified that she purchased the Taser for Reaves because convicted felons cannot purchase or register Tasers.

The evidence also showed that a white van was later found in a remote area near the scene. It had been set on fire. Bullet holes in the van were consistent with Hervey's testimony that he shot at the van as the robbers fled. Reaves was arrested several days after the robbery and was found in need of medical attention in connection with the treatment of a bullet wound. Police later determined that Reaves had been treated for a gunshot wound in East Saint Louis, Illinois, less than 12 hours after the robbery. Following his arrest, police executed a search warrant at the home where he was arrested and found paperwork from the medical treatment in East St. Louis, as well as a large amount of cash, mainly in twenty- and one-hundred-dollar bills. Employees of the Douglas County Treasurer's Office testified that

5

the office receives significant cash payments and that, at the end of the month to the first of any month, they have a significant number of twenty- and one-hundred-dollar bills on hand.

Ruffin testified that Reaves is the father of her fourteen-year old nephew. She testified that Reaves asked her to purchase a Taser for him in January 2009 and that he came to her house and took it after she had registered it. She stated that she had no contact with Reaves between the time she gave him the Taser and the time of the armored car robbery. Ruffin was extensively cross-examined by defense counsel. On cross- examination, Ruffin admitted that she had lied to the police when she was first questioned.

Reaves testified on his own behalf. He testified that he was at the scene of the robbery to sell marijuana and had been caught in the cross-fire. He further testified that he had been shot in the arm and drove to East St. Louis, Illinois, with a friend for medical treatment because he was afraid police would either connect him to the robbery or search his house and find his marijuana grow operation. He also stated that the cash found in his house was the proceeds from his marijuana sales.

Reaves contends that the government violated *Brady* by failing to disclose the phone records, which indicate that eleven calls were made from Ruffin's phone to Reaves in March and April of 2009. Reaves argues that this evidence directly contradicts Ruffin's trial testimony that she had no contact with him between January 6, 2009, and the armored car robbery on May 1, 2009. Reaves argues that the significance of the phone records is that the evidence adduced at trial showed that the robber used a Taser that was traced to Ruffin and Ruffin claimed that she purchased the Taser for Reaves. Reaves's defense was that he was in the area of the robbery because he had gone to the Treasurer's Office to register the title of his vehicle, and that his blood was found at the scene because he was an innocent bystander who was caught in the crossfire when the robbery occurred. Reaves argues that

without Ruffin's testimony connecting him to the Taser, there was no evidence to tie him to the robbery other than his presence at the scene. He argues that Ruffin's testimony was crucial to the government's case because it essentially nullified his defense. He contends that had Ruffin's testimony been discredited, there is a reasonable probability that the outcome of the trial may have been different and confidence in the verdict has been undermined.

II.     DISCUSSION

A.     Law

The court may grant a new trial to the defendant "if the interests of justice so require." Fed. R. Crim. P. 33. Generally, the standard for a new trial on the basis of newly discovered evidence "is 'rigorous' because these motions are 'disfavored.'" *United States v. Baker*, 479 F.3d 574, 577 (8th Cir. 2007). In order to receive a new trial based on newly discovered evidence, a defendant must show: (1) the evidence must have been unknown or unavailable to the defendant at the time of trial; (2) the defendant must have been duly diligent in attempting to uncover it; (3) the newly discovered evidence must be material; and (4) the newly discovered evidence must be such that its emergence probably will result in an acquittal upon retrial. *Id.* A standard more favorable to the defendant is applied, however, if a *Brady* violation has occurred. *United States v. Duke*, 50 F.3d 571, 577 (8th Cir. 1995).

The government's failure to disclose evidence that is material to the issue of guilt and is exculpatory in nature violates a defendant's right to due process. *Brady*, 373 U.S. at 87. The government has an obligation to disclose evidence that is favorable to the accused and material to either guilt or punishment, and this duty extends to impeachment evidence. *United States v. Ladoucer,* 573 F.3d 628, 636 (8th Cir. 2009). The constitutional obligation is not measured by the moral culpability of the prosecutor. *United States v. Agurs*, 427 U.S. 97, 109 (1976).

7

To show a *Brady* violation, the defendant must establish that (1) the evidence was favorable to the defendant, (2) the evidence was material to guilt, and (3) the government suppressed evidence. *Id.* Evidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009). "In other words, favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule, and it is subjected to the same materiality analysis. *United States v. Bagley*, 473 U.S. 667, 676-78 (1985) (noting that "such evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal") (citations omitted).

Under *Giglio v. United States*, 405 U.S. 150, 153-55 (1972), the government must disclose matters that affect the credibility of prosecution witnesses. *See United States v. Garcia*, 562 F.3d 947, 952 n.7 (8th Cir. 2009). However, the non-disclosure of *Giglio* evidence only justifies a retrial if the withheld information is deemed material. *United States v. Spinelli*, 551 F.3d 159, 164 (2d Cir. 2008). Undisclosed *Brady/Giglio* information is deemed material so as to justify a retrial only if there is a reasonable probability that, had the material been disclosed to the defense, the result of the proceeding would have been different. *Garcia*, 562 F.3d at 953. A reasonable probability of a different result is shown when the government's failure to disclose undermines confidence in the outcome of the trial. *Id.* However, there is no *Brady* violation if the defendant, using reasonable diligence, could have obtained the information himself. *Ladoucer*, 573 F.3d at 636.

The duty to disclose such evidence is applicable even though there has been no request by the accused. *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Moreover, the *Brady* rule "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler,* 527 U.S. at 280-81 (quoting *Kyles*, 514 U.S. at 438). The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. *Strickler,* 527 U.S. at 281.

      B.     Analysis

There is no dispute that the government, in the person of Officer Chandler, was in possession of phone records and did not provide them to Reaves. The government concedes that they should have been given to the defense. The materials were exculpatory in that they could have been used to impeach a key government witness. However, the court finds there is no reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. The defendant has not shown that the government's failure to disclose this information undermines confidence in the outcome of the trial. First, the evidence does not directly contradict Ruffin's testimony at trial that she had no contact with Reaves so as to impeach her credibility as a witness. On cross-examination, she was shown to have lied to police, so her credibility had already been attacked to some extent. The length of the calls is consistent with a call wherein no conversation took place, so the fact that the calls were placed does not indicate that contact took place, even if they had been placed by Ruffin. Also, Ruffin shared her home with others who had access to her land line, with others, including Reaves's son and the child's mother. It is equally likely that another person placed the calls to Reaves. Moreover, if it were shown that Ruffin did have contact with Reaves in the spring of 2009, that fact would hardly undermine her testimony that she bought the Taser for Reaves; rather it demonstrates an even closer connection to him.

Even if the withheld evidence were sufficient to completely undermine Ruffin's credibility, the other evidence linking Reaves to the robbery is compelling, if not overwhelming. Reaves's DNA was recovered from the scene. He sought medical treatment for a bullet wound in a city almost 500 miles away from Omaha. No witnesses saw a bystander at the scene. His defense, that he was at the scene to get his license renewed, and perchance sell marijuana to the one of the robbers, whom he could not identify, defied credulity and was rejected by the jury. Based on its familiarity with the evidence presented at trial, the court finds that establishing a link between the Taser found at the scene and the defendant, although important, was not crucial to the government's case and there is no reasonable probability that the outcome of the case would have been different had the evidence been disclosed.

Furthermore, the records withheld were the defendant's own billing records. He arguably had at least as much access to the records as the government did. Reaves's cell phone records would have previously been sent to him in the ordinary course of business in the form of his monthly billing statements. To the extent his own billing records would not reveal what was shown in the subpoenaed records, he was free to subpoena the records himself. However, the court acknowledges that the telephone records in question were difficult to obtain and it took considerable prodding by the court and defense counsel to eventually obtain them from the Sprint Subpoena Compliance Department. The court also acknowledges that Officer Chandler's conduct in this matter was less than adequate or appropriate. He was the sole point of government contact for these records and he did not provide them to the defense despite a request by the U.S. Attorney. It was not unreasonable for defense counsel to rely on the government's representation that all relevant subpoenaed telephone records had been provided. Nevertheless, if the defendant had actual telephone

contact with Ruffin and the subpoenaed telephone records did not reflect those calls, then the records could have been obtained in the course of discovery. Accordingly, the court finds that Reaves's motion for new trial should be denied.

IT IS ORDERED that the defendant's motion for a new trial (Filing No. 105) is denied.

DATED this 9th day of August, 2009.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

11